**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15–542–SLR–SRF |
| | ) | |
| APPLE INC., | ) | **FILED UNDER SEAL** |
| | ) | |
| Defendant. | ) | |
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15–543–SLR–SRF |
| | ) | |
| HTC CORPORATION and | ) | **FILED UNDER SEAL** |
| HTC AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 15–544–SLR–SRF |
| LENOVO GROUP LTD., | ) | |
| LENOVO (UNITED STATES) INC., and | ) | **FILED UNDER SEAL** |
| MOTOROLA MOBILITY, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

| | |
|---|---|
| EVOLVED WIRELESS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD.<br>and SAMSUNG ELECTRONICS<br>AMERICA, INC.,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | C.A. No. 15–545–SLR–SRF<br><br>**FILED UNDER SEAL** |

| | |
|---|---|
| EVOLVED WIRELESS, LLC,<br><br>Plaintiff,<br><br>v.<br><br>ZTE (USA) INC.,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| | C.A. No. 15–546–SLR–SRF<br><br>**FILED UNDER SEAL** |

**PLAINTIFF EVOLVED WIRELESS, LLC'S OPENING BRIEF IN SUPPORT OF
CROSS-PRODUCING LICENSES ACROSS THE RELATED CASES**

Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
FARNAN LLP
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com


Christopher K. Larus (admitted pro hac vice)
Marla R. Butler (admitted pro hac vice)
Ryan M. Schultz (admitted pro hac vice)
Andrew D. Hedden (admitted pro hac vice)
Benjamen C. Linden (admitted pro hac vice)
Ryan E. Dornberger (admitted pro hac vice)

Anthony F. Schlehuber (admitted pro hac vice)
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
clarus@robinskaplan.com
mbutler@robinskaplan.com
rschultz@robinskaplan.com
ahedden@robinskaplan.com
blinden@robinskaplan.com
rdornberger@robinskaplan.com
aschlehuber@robinskaplan.com

Andrea L. Gothing (admitted pro hac vice)
ROBINS KAPLAN LLP
2440 W. El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
agothing@robinskaplan.com

Dated: October 21, 2016

**Counsel For Plaintiff Evolved Wireless, LLC**

# TABLE OF CONTENTS

**Page**

**Nature and Stage of the Proceedings** ............................................................. 1

**Summary of the Argument** ............................................................................. 2

**Factual Background** ........................................................................................ 3

**Argument** ......................................................................................................... 5

   I.   The LTE licenses are highly relevant to each of the related cases. ....................................5

       A.   In determining a FRAND royalty rate, the parties are not confined to application of the *Georgia-Pacific* factors. ...................................6

       B.   The LTE licenses are highly relevant to the broad set of considerations applicable to the FRAND analysis. ...........................7

       C.   Even if *Georgia-Pacific* factors are applied in this case, the licenses are still highly relevant. ...................................11

       D.   At this discovery stage, the Court need only decide the question of production, not the question of admissibility of Defendants' LTE licenses at trial. ...................................12

   II.   Any confidentiality concerns can be mitigated by appropriate protective measures. ...................................13

       A.   The Protective Order already provides broad protection for Defendants and Third Parties. ...................................13

       B.   Cross-production of the LTE licenses will not impact future negotiations.................15

       C.   The relevance of the LTE licenses outweighs the risk of inappropriate use. .............16

   III.   Cross-production of LTE licenses will not unreasonably expand the scope of discovery. ...................................17

   IV.   The additional third party production agreements do not prohibit cross-production of the licenses under section 6(g) of the Protective Order. ...........................19

**Conclusion** ..................................................................................................... 20

i

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Blackbird Tech LLC v. Serv. Lighting & Elec. Supplies, Inc.*,
No. 15-53, 2016 U.S. Dist. LEXIS 65308 (D. Del. May 18, 2016)..........................................15

*Callwave Commc'ns. LLC v. AT&T Mobility LLC, et al.*,
No. 12-1701-RGA, D.I. 599 (D. Del. June 30, 2016).............................................................18

*Diamond Crystal Salt Co. v. Package Masters*,
319 F. Supp. 911 (D. Del. 1970)...........................................................................................15

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014)..........................................................................6, 7, 10, 11, 17

*Fromson v. Western Litho Plate & Supply Co.*,
853 F.2d 1568 (Fed. Cir. 1988)..............................................................................................12

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970)................................................................2, 6, 7, 11, 12, 17

*GlaxosmithKline LLC v. Teva Pharms. USA, Inc.*,
No. 14-878-LPS, 2016 U.S. Dist. LEXIS 27910 (D. Del. Mar. 3, 2016)...............................18

*Honeywell Int'l Inc v. Apple Comp., Inc.*,
No. 04-1337, No. 612 (D. Del. Mar. 5, 2009) .......................................................................13

*In re Innovatio IP Ventures, LLC*,
No. 11-C-9308, 2013 U.S. Dist. LEXIS 144061 (N.D. Ill. Oct. 3, 2013) ....................8, 10, 17

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009)..............................................................................................12

*Manning v. Herman*,
No. 1:13-cv-01426, 2016 U.S. Dist. LEXIS 124574 (M.D. Pa. Sep. 14, 2016)....................13

*Microsoft Corp. v. Motorola, Inc.*,
795 F.3d 1024 (9th Cir. 2015) ......................................................................................6, 7, 9, 10

*Microsoft Corp. v. Motorola, Inc.*,
No. C10-1823, 2013 U.S. Dist. LEXIS 60233
(W.D. Wash. Apr. 25, 2013),.......................................................................7, 8, 9, 11, 12, 17

*Nazomi Communs., Inc. v. ARM Holdings*,
No. C-02-02521, 2002 U.S. Dist. LEXIS 21400 (N.D. Cal. Oct. 11, 2002) ..........................16

ii

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
    289 U.S. 689 (1933)...............................................................................................................12

**Rules**

Fed. R. Civ. P. 26..................................................................................................................5, 12

**Other Authorities**

ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy § 3.1
    (2016).........................................................................................................................................4

Pursuant to the Court's request for additional briefing regarding the cross-production of Defendants' Long Term Evolution ("LTE") licenses across all six related cases,[1] Evolved Wireless submits this brief in support of cross-production.

## Nature and Stage of the Proceedings

Evolved Wireless filed suit against Defendants for infringement of five patents that are essential to the practice of the LTE cellular standard developed by the Third Generation Partnership Project ("3GPP"). To ensure the confidentiality of sensitive documents was protected, the parties negotiated a stipulated Protective Order that the Court subsequently entered in each case. *See, e.g.,* D.I. 35.[2] Pursuant to the Scheduling Order, and subject to the Protective Order, Defendants produced any license pertaining to patents that are essential to the LTE cellular standard.

Included in the Protective Order is section 6(g), which permits Evolved Wireless to cross-produce discovery material, regardless of confidentiality designation, with the relevant Defendant's written consent. Defendants are not to unreasonably withhold consent. Evolved Wireless sought the cross-production of LTE licenses produced by Defendants in the six related cases. Defendants and third parties licensees/licensors objected to the production. Pursuant to section 6(g) of the Protective Order, Evolved Wireless brought the current dispute to the Court's attention.

---

[1] The six related cases are C.A. Nos. 15-542-SLR-SRF, 15-543-SLR-SRF, 15-544-SLR-SRF, 15-545-SLR-SRF, 15-566-SLR-SRF, and 15-547-SLR-SRF.
[2] For simplicity, Docket Numbers refer to Case Number 15-542-SLR-SRF unless otherwise noted.

## Summary of the Argument

1.        The patents-in-suit[3] are standard essential patents ("SEP") for LTE cellular technology.  Evolved Wireless has committed to license these patents on fair, reasonable, and non-discriminatory ("FRAND")[4] terms. A FRAND determination requires context. Where, as here, a fact finder must determine a FRAND licensing rate to each of Evolved Wireless's LTE patents and must also evaluate Defendants' allegations that Evolved Wireless's pre-litigation royalty rate offer was not FRAND, the appropriate context includes what it generally costs to license an LTE patent. In other words, what is "fair" and "reasonable" should be defined at least in part by common, accepted practices. In addition, this larger context is important to the parties' obligations to apportion the value of Evolved Wireless's LTE patents within the value of the entire LTE standard and to reduce the risk of royalty stacking. For these reasons, FRAND issues should not be addressed within the confines of agreements entered into by a single player in the LTE industry. Rather, these issues should be addressed in the context of LTE licenses generally.

In addition, when determining the appropriate reasonable royalty in SEP cases, the fact finder is not bound to the 15 factors set forth in *Georgia-Pacific*. Courts addressing SEPs have held that the *Georgia-Pacific* factors need not be used at all. And when those factors are used, the FRAND obligation requires significant modifications to those factors, including discarding several of them. Therefore, the relevance of one Defendant's LTE licenses to issues in another Defendant's case should not be viewed only through the lens of the *Georgia-Pacific* factors. Rather, the relevance of these licenses should be viewed through the lens of the FRAND

---

[3] The patents-in-suit are United States Patent Nos. 7,746,916, 7,768,965, 7,809,373, 7,881,236, and 8,218,481.
[4]  FRAND is sometimes referred to as RAND (reasonable and non-discriminatory).

obligation—an obligation that, by definition, requires context beyond a single Defendant's licensing activities.

2.      The Protective Order negotiated by parties to all six related cases provides the mechanism for cross-producing the LTE licenses and sufficient protections for maintaining the confidentiality of the licenses. There is no basis to doubt that all parties' counsel will abide by the terms of the Protective Order. In addition, Evolved Wireless is willing to add a higher designation for the LTE licenses by agreeing to an "Outside Attorney's Eyes Only" designation to further shield the LTE licenses.

3.      Finally, the scope of the case will not be unreasonably expanded by cross-production of the LTE licenses. The relevant information is ascertainable from the licenses themselves or through discovery that can be completed in the timeframe set forth in the Scheduling Order. There is no need for extensive additional discovery as Defendants claim.

Because the relevance of the LTE licenses to each of the cases significantly outweighs the confidentiality and discovery burden concerns raised by Defendants, Evolved Wireless respectfully requests that the Court permit the cross-production of LTE licenses.

**Factual Background**

The LTE standard provides a uniform set of specifications that permits companies to design and build products with the knowledge that they will be interoperable with each other worldwide. D.I. 1 at ¶ 7. The LTE standard was developed by 3GPP with the goal of developing a cellular specification that would meet the needs of the modern consumer, such as increased data transfer rates and reliability. *Id.* at ¶ 23.

3GPP is made up of Organizational Partners that are major telecommunications standards developing organizations from around the world, including the European Telecommunications

Standards Institute ("ETSI"). *Id.* at ¶ 7. Companies participate in 3GPP via their membership in one of the Organizational Partners. *Id.*

3GPP participants must abide by the intellectual property rights ("IPR") policy of the Organizational Partners to which they belong. *Id.* at ¶ 12. These IPR policies, such as the ETSI IPR policy, are intended to strike "a balance between the needs of standardization for public use in the field of telecommunications and the rights of the owners of IPRs."[5] *Id.* at ¶ 12. "IPR holders whether members of ETSI and their AFFILIATES or third parties, should be adequately and fairly rewarded for the use of their IPRs in the implementation of STANDARDS and TECHNICAL SPECIFICATIONS."[6] *Id.* The IPR policy further requires that the owner make an "irrevocable undertaking in writing that it is prepared to grant irrevocable licenses on fair, reasonable and non-discriminatory ('FRAND') terms and conditions."[7]

LG Electronics ("LG") developed the inventions embodied in the patents-in-suit. LG participated in the LTE standard setting process. *Id.* at ¶ 16. As part of this process, LG declared the patents-in-suit as standard essential, pursuant to ETSI's IPR policy, and agreed to be prepared to license the patents-in-suit under FRAND terms. *Id.* at ¶ 15. By assignment, Evolved Wireless currently owns the patents-in-suit and is bound by the terms of ETSI's IPR policy. *Id.*

Evolved Wireless accuses Defendants of infringing the patents-in-suit by manufacturing, importing, and using devices capable of implementing the LTE standard. *Id.* at ¶¶ 68, 79, 90, 101, 112. Defendants are some of the largest manufacturers and sellers of LTE-capable devices. In addition, five of the six Defendants in these cases asserted affirmative defenses and/or

---

[5] ETSI Rules of Procedure, Annex 6: ETSI Intellectual Property Rights Policy § 3.1 (2016), available at http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf.

[6] *See supra* note 5 § 3.2.

[7] *See supra* note 5 § 6.1.

counterclaims alleging that Evolved Wireless breached its FRAND obligations by not offering

license terms that were fair, reasonable and non-discriminatory. Before filing suit, Evolved

Wireless attempted to negotiate with each of the Defendants and proposed license terms,

including a rate "not to exceed 25 cents" per LTE-enabled device. *See, e.g.,* D.I. 9 at ¶ 29.[8]

## Argument

Cross-production of the LTE licenses should be ordered by the Court because under

Federal Rule of Civil Procedure 26, Evolved Wireless has the right to discovery of "any

nonprivileged matter that is relevant to any party's claim or defense and proportional to the

needs of the case." Because the LTE licenses are highly relevant to determining a FRAND

royalty rate and to Defendants' claim that Evolved Wireless breached its FRAND obligations,

Defendants' LTE licenses more than satisfy this relevance threshold for discovery. In fact, the

relevance of Defendants' LTE licenses far outweighs Defendants' confidentiality objections,

especially in light of the Protective Order. Therefore, all of the Defendants' LTE licenses should

be available for consideration in each related case.

## I.    The LTE licenses are highly relevant to each of the related cases.

The collection of Defendants' LTE licenses provides industry data about the value of the

LTE standard generally and the value of individual patents essential to that standard. This

industry data is highly relevant to determining a fair, reasonable, and non-discriminatory royalty

rate for Evolved Wireless's patents-in-suit, ensuring that this FRAND rate meets relevant

apportionment requirements, and providing evidence that no royalty stacking concern limits the

appropriate FRAND royalty. This data is also highly relevant to a determination regarding

---

[8] *See also* C.A. Nos. 15-543, D.I. 10 at 17, ¶ 131; 15-544, D.I. 1 at ¶¶ 68-69; 15-545, D.I. 68 at 26, ¶ 27; 15-546, D.I. 1 at ¶¶ 68-69; 15-547, D.I. 17 at 45, ¶ 29.

Defendants' allegations that Evolved Wireless's pre-suit license offer to each of the Defendants failed to meet the requirements of the ETSI IPR policy.

> **A.   In determining a FRAND royalty rate, the parties are not confined to application of the *Georgia-Pacific* factors.**

In all of these related cases, the fact finder will be tasked with determining a FRAND rate for each of the asserted LTE patents. In addition, Evolved Wireless will defend against Defendants' claims that Evolved Wireless's pre-litigation offers to license these LTE patents were not FRAND. Resolving these issues requires a different approach than the approach employed in traditional patent infringement cases.

Many of the *Georgia-Pacific* factors are not relevant in cases involving FRAND-encumbered patents, and many are indeed contrary to FRAND principles. *See Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1230-31 (Fed. Cir. 2014). Instead of focusing solely on the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), a court must instead apply a more flexible approach when FRAND obligations drive the damages analysis. Indeed, in *Microsoft Corp. v. Motorola Inc.*, the Ninth Circuit explicitly acknowledged the "need for flexibility in determining a royalty rate for a RAND-encumbered patents." 795 F.3d 1024, 1042 (9th Cir. 2015) (citing *Ericsson,* 773 F.3d at 1230-31).

This need for flexibility stems from the fact that any license to a FRAND-encumbered patent must be fair, reasonable, and non-discriminatory. Unlike traditional patent infringement cases, the damages analysis in FRAND cases is not solely based on the commercial relationship between the patent owner and accused infringer. In fact, this commercial relationship has little relevance in a FRAND damages analysis. For example, the *Ericsson* court noted that *Georgia-Pacific's* factor 5—"the commercial relationship between the licensor and licensee"—is irrelevant in the RAND context because of the "nondiscriminatory" requirement. *Ericsson*, 773

F. 3d at 1230-1231. The ability to rely on a broad group of licenses to LTE patents—licenses entered into by the biggest players in the manufacture of LTE products—allows for a determination of a FRAND rate that is consistent with industry norms and therefore demonstrably non-discriminatory.

Recognizing the limited applicability of the *Georgia-Pacific* factors in FRAND cases, the Federal Circuit has explicitly held that a reasonable royalty determination does not require application of the *Georgia-Pacific* factors at all. *Ericsson, Inc.*, 773 at 1231. Notably, even in traditional (*i.e.,* non-FRAND cases) the Federal Circuit does "not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases." *Id.* at 1230*; see also Microsoft*, 795 F.3d at 1041 ("the Federal Circuit has 'never described the *Georgia-Pacific* factors as a talisman for royalty rate calculations.'") (citing *Ericsson*, 773 F.3d at 1230).

B.      **The LTE licenses are highly relevant to the broad set of considerations applicable to the FRAND analysis.**

Broad considerations, including rates paid for LTE licenses by others in the industry, are relevant to the FRAND analysis. Determining a FRAND rate for Evolved Wireless's licenses and determining whether Evolved Wireless's pre-suit offers were FRAND will be significantly aided by understanding factors that are common across industry licenses. Without some reference point—such as a collection of actual licenses and rates from other industry members as exists here—to compare against, the ability to determine a benchmark for what is fair, reasonable, and non-discriminatory is hampered. Put simply, use of industry wide information related to the value of LTE patents significantly aids the FRAND determination. *See, e.g., Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 U.S. Dist. LEXIS 60233, at *190-283 (W.D. Wash. Apr. 25, 2013) (providing extensive description of licenses relevant to the RAND analysis); *see also In re Innovatio IP Ventures, LLC*, No. 11-C-9308, 2013 U.S. Dist. LEXIS

144061, at *139-160 (N.D. Ill. Oct. 3, 2013).

Other courts have relied on industry level information in making FRAND determinations. For example, in *Microsoft*, the court analyzed several licenses beyond those to which the plaintiff or defendant was a party. In its royalty rate opinion, the court examined a license between Marvell, a third party to the litigation, and ARM holdings, another third party. *Microsoft*, 2013 U.S. Dist. LEXIS 60233 at *278. The court in *Microsoft* concluded that the Marvell rate "provides an indicator" for the proper FRAND royalty rates because "the experiences of Marvell, *a third-party*, tend to establish what is customary in the business of semiconductor licensing." *Id.* (emphasis added).

Defendants have argued that the *Microsoft* court's use of the Marvell license is distinguishable from the production of third-party LTE licenses here because Marvell sold its products to Microsoft. However, this ignores the actual reason that the *Microsoft* court adopted the Marvell rate in its FRAND calculation. Indeed, Marvell's relationship with the parties-in-suit was not part of the court's calculus at all. Rather, "the court conclud[ed] that Marvell's experience with the ARM rate shows that the 1% rate represents a reasonable 'high ceiling' royalty rate in the semiconductor intellectual property licensing." *Id.* at *282. Because the Marvell license was an indicator of the industry as a whole—irrespective of the fact that it sold products to a party-in-suit—the court *directly* applied the 1% rate as "an indicator of a RAND rate for Motorola's 802.11 SEP portfolio." *Id.* at *283. Similarly, in this case, every LTE license presents another example of a FRAND rate for Evolved Wireless's LTE portfolio. For this reason, those LTE licenses should be produced.

The *Microsoft* court also considered patent pool licenses, *id.* at *217, and a third-party patent portfolio analysis of Motorola's SEP patents by a consulting firm InteCap, Inc., *id.* at

*285. In both circumstances, the court concluded that this evidence presented indicators of a reasonable royalty even though these were not arms-length negotiated licenses between the patent owner and accused infringer. As to the patent pools, the court in *Microsoft* found that despite the unique structure of patent pools in comparison to a traditional license between individual parties, the characteristics of the pool "closely align with all purposes of the RAND commitment" and was thus a "strong indicator of a RAND royalty rate." *Id.* at *242. In affirming the district court's analysis, the Ninth Circuit approved the consideration of patent pools, even though different patents and different parties were involved, because the patents at issue in that case "were essential to the same technical standards" as the patents in the patent pools. *Microsoft*, 795 F.3d at 1043.

Similarly, the analysis conducted by InteCap was adopted by the court in *Microsoft* as an indicator of an appropriate RAND rate. The InteCap analysis analyzed the value of Motorola's portfolio of SEP patents through an approach that segmented license markets and target companies. *Microsoft*, 2013 U.S. Dist. LEXIS 60233 at *285. Based on this segmentation and taking into account a "the value of the [standard] functionality related to [the] total product functionality" and the "portion of total [standard] functionality enabled Motorola IP," the InteCap analysis was considered an appropriate data point for determining a FRAND rate. *Id.* Despite the fact that this analysis was based on factors well beyond licenses alone, the Court admitted the evidence because it too "exhibit[ed] characteristics consistent with the principles underlying the RAND commitment." *Id.* at *290.

The Ninth Circuit upheld the FRAND royalty calculation in *Microsoft* given the need for "flexibility" in determining the appropriate royalty rate for a FRAND-encumbered patent. *Microsoft*, 795 F.3d at 1042; *see also Innovatio*, 2013 U.S. Dist. LEXIS 144061 at *155, 159

9

(considering the applicability of patent pools and even non-FRAND encumbered patent licenses to the patents-in-suit). Under the "flexible" approach dictated by cases such as *Ericsson* and *Microsoft*, relevant licenses may come in a variety of forms. Each license related to the technical standard in question can provide a meaningful data point in calculating a FRAND royalty rate. There is no reason such flexibility should not be applied in this case as well.

The *Innovatio* court also acknowledged the usefulness of industry-level information. In that case, the court determined a royalty rate based on a numerical calculation that accounted for various pertinent factors, including industry level information. *Innovatio*, 2013 U.S. Dist. LEXIS 144061 at *154, 159. For example, the court relied on an industry research report conducted by a consulting group to determine the total number of patents potentially essential to the Wi-Fi standard. *Id.* at *177-78. And importantly, the court looked to other RAND determinations for licenses to Wi-Fi patents—determinations involving *different parties and different patents*—to confirm that the *Innovatio* court's rate was reasonably comparable to those other RAND rates. *Id.* at *183-86.

The *Innovatio* court's need to apply an alternative method to the FRAND valuation was based on the court's conclusion that "RAND licenses are relatively rare in the marketplace at this time." *Id.* at *168. Thus, *Innovatio* underscores the need to have access to as many FRAND licenses as possible when determining a FRAND royalty rate. The *Innovatio* court's concern regarding the limited number of RAND licenses can be alleviated here through the cross-production of LTE licenses.

Use of the LTE licenses across all cases will also help the parties meet apportionment requirements. The Federal Circuit requires that "a royalty award for a SEP must be apportioned to the value of the patented invention (or at least the approximate value thereof), not the value of

the standard as a whole." *Ericcson*, 773 F.3d at 1232-33. The LTE licenses produced by the

Defendants in these coordinated cases are highly relevant to the parties' obligations to apportion

the value of Evolved Wireless's LTE technology in a manner that accounts for the value of the

patents-in-suit in the larger context of the entire LTE standard.

Further, production of the relevant LTE licenses will provide evidence that the FRAND

rate for Evolved Wireless's patents is not affected by royalty stacking. The royalty stacking

concern arises because cumulative royalty payments to all standard-essential patent holders can

become excessive and discourage adoption of the standard. *Microsoft*, 2013 U.S. Dist. LEXIS

60233, at *40-41. To avoid royalty stacking, the overall licensing landscape must be taken into

account, which includes consideration of other LTE standard patent holders and the royalties

they have sought. *Id.* at *41. Permitting the use of LTE licenses across cases will help ensure that

"the aggregate royalties associated with a given standard are reasonable." *Id.* at *40.

## C.  Even if *Georgia-Pacific* factors are applied in this case, the licenses are still highly relevant.

Cross-production of the LTE licenses should be permitted even if the *Georgia-Pacific*

factors are applied to determine a FRAND royalty rate. In *Microsoft*, the court applied a

modified form of the *Georgia-Pacific* factors, concluding that the factors must be modified to

reflect the FRAND obligation imposed on the patents. *See also Ericsson*, 773 F.3d at 1230 ("In a

case involving RAND-encumbered patents, many of the *Georgia-Pacific* factors simply are not

relevant.").

To the extent these factors are applied, the LTE licenses produced by all Defendants are

relevant to factor 12, as modified by the *Microsoft* court. Factor 12 typically requires

consideration of "the portion of the profit or of the selling price that may be customary in the

particular business or in comparable businesses to allow for the use of the invention or analogous

inventions." *Microsoft*, 2013 U.S. Dist. LEXIS 60233, at *62 (citing *Georgia-Pacific*, 318 F.

Supp. at 1120). In the *Microsoft* case, the district court modified this factor to require

consideration of "customary practices of *businesses licensing RAND-committed patents.*" *Id.*

(emphasis added). In this case, as in *Microsoft*, the Defendants' LTE licenses provide direct

evidence of the licensing practices of businesses licensing LTE patents. *Id.* at *278 ("[T]he

experiences of Marvell, a third-party, tend to establish what is customary in the business of

semiconductor licensing.").

Further, the licenses can play a factor in the hypothetical negotiation analysis through the

"Book of Wisdom" analysis, originally laid out in *Sinclair Refining Co. v. Jenkins Petroleum

Process Co.*, 289 U.S. 689, 698 (1933). As the Federal Circuit has found, "the hypothetical

negotiation analysis 'permits and often requires a court to look to events and facts that occurred

thereafter and *that could not have been known to or predicted by the hypothesized negotiators*.'"

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1333 (Fed. Cir. 2009) (citing *Fromson v.

Western Litho Plate & Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988)) (emphasis added). The

LTE licenses of all the Defendants may not have been at hand when negotiating the hypothetical

negotiation, but that does not bar the fact finder from considering them. Thus, regardless of

whether the *Georgia-Pacific* factors are applied to determine a royalty rate for the patents-in-suit,

Defendants' LTE licenses are highly relevant and should be produced across all cases.

    **D.**    **At this discovery stage, the Court need only decide the question of production, not the question of admissibility of Defendants' LTE licenses at trial.**

As discovery is ongoing at this stage of the cases, the Court need only make a ruling on

the cross-production of Defendants' LTE licenses. The admissibility of the LTE licenses will be

determined at or closer to trial. Different standards govern discoverability and admissibility as

information "need not be admissible in evidence to be discoverable." Fed. R. Civ. P. 26(b)(1);

*see also Honeywell Int'l Inc. v. Apple Comp., Inc.,* Ex. B, No. 04-1337, No. 612, at *10 (D. Del. Mar. 5, 2009) (distinguishing discoverability under Fed. R. Civ. P. 26 and the higher burden of admissibility); *Manning v. Herman*, No. 1:13-cv-01426, 2016 U.S. Dist. LEXIS 124574, at *9-10 (M.D. Pa. Sep. 14, 2016) ("Admissibility as competent evidence is not the hallmark of discoverability; the discovery standard is less stringent—it requires only a reasonable likelihood that the discovered information will bring about the production of relevant evidence.").

Defendants are part the same industry and have produced licenses that pertain to LTE essential patents. Any determination of admissibility regarding these LTE licenses cannot happen until the licenses are cross-produced for consideration by the parties' experts and the parties and experts have an opportunity to establish their ultimate admissibility. The potential use of such licenses should not be cut off at the discovery stage.

## II.     Any confidentiality concerns can be mitigated by appropriate protective measures.

### A.     The Protective Order already provides broad protection for Defendants and Third Parties.

The parties negotiated the Protective Order entered by the Court to ensure confidential material is sufficiently protected. The Protective Order requires that all protected materials be used "solely for this case and any related appellate proceeding, and not for any other purpose whatsoever, including . . . any *business or competitive purpose or function*." D.I. 35 at ¶ 6(a) (emphasis added). The Protective Order also requires that protected material must be "stored and maintained by a Receiving Party in the United States in a secure manner that ensures that access is limited to the persons authorized under this Order." *Id.* at ¶ 6(c). Any designated protected material must also be filed under seal with the Court. *Id.* at ¶ 16(b).

For information that is highly confidential—as Defendants have characterized their LTE licenses—the designation "Confidential-Attorneys' Eyes Only" provides a strict level of

13

protection. Among other requirements, a party receiving such designated material may provide the information to no more than three in-house attorneys who are not competitive decision makers with the company. *Id.* at § 9(b)(ii). Additionally, disclosure of information to outside experts requires prior notice to the disclosing party and requires the experts to sign a declaration that binds the expert to the Protective Order's provisions.

For a stricter layer of protection, Evolved Wireless has proposed an additional designation of "CONFIDENTIAL- OUTSIDE COUNSEL EYES ONLY" for the production of LTE licenses across related cases, which would limit access to only outside counsel for the parties. The Protective Order permits parties and non-parties to propose such additional protections. *Id.* at § 13(c). However, Defendants and the non-parties that have objected to production have proposed no such additional protections. Instead, Defendants and these non-parties have simply refused production.

Section 6(g) of the Protective Order sets forth the procedure for Evolved Wireless to cross-produce materials to Defendants. The parties included the cross-production provision in the Protective Order to facilitate the Court's order that parties "coordinate fact discovery in the six (6) above-captioned cases." D.I. 16 at ¶ 1(d). Evolved Wireless could have issued subpoenas to all the other Defendants in each case. But this would have resulted in five duplicative subpoenas per case. For example, Evolved Wireless would be subpoenaing Apple five times for the same information from five cases.

Serving thirty subpoenas covering the same subject matter is exactly the waste of the Court's and parties' resources that the order to coordinate discovery was intended to mitigate. In particular, section 6(g) of the Protective Order streamlines the process by allowing the Court to review the issues in one motion and reach a decision regarding cross-production without the need

to issue unnecessary third-party subpoenas. As such, this court can resolve the issue of cross-production without the need to expand the scope of discovery.

The Protective Order's restrictions provide more than adequate protection for the LTE licenses. This Court has held that "[n]o absolute privilege protects confidential information from disclosure through the discovery process." *Diamond Crystal Salt Co. v. Package Masters*, 319 F. Supp. 911, 912 (D. Del. 1970). While there is a recognized need to keep some documents confidential, the Protective Order governs production by meaningfully limiting the number of individuals who can access highly confidential the information. Evolved Wireless and Defendants negotiated a tiered protective structure in response to the risk of unintended access. Only outside counsel plus three in-house non-competitive decision makers are allowed access to highly confidential documents.

The Protective Order was sufficient to permit the production of the licenses to Evolved Wireless—yet Defendants claim the same provisions are insufficient for the cross-production to Defendants. Evolved Wireless is a competitor with Defendants just as Defendants are competitors to each other. *See Blackbird Tech LLC v. Serv. Lighting & Elec. Supplies, Inc.*, No. 15-53, 2016 U.S. Dist. LEXIS 65308, at *16-17 (D. Del. May 18, 2016) (finding that a plaintiff is still a competitor with defendants in the marketplace even if it does not directly compete by designing or manufacturing products). Thus, if Defendants can produce their LTE licenses to Evolved Wireless, the Protective Order is more than sufficient to protect the cross-production of LTE licenses to other Defendants.

**B.      Cross-production of the LTE licenses will not impact future negotiations.**

The cross-production of LTE licenses will not impact current or future negotiations between Defendants and/or third parties. The Protective Order limits in-house counsel access to information designated "CONFIDENTIAL – ATTORNEYS' EYES ONLY" to three in-house

attorneys who are *not competitive decision makers*. D.I. 35 at § 9(b)(ii) (emphasis added).

Therefore, in-house attorneys involved in negotiating agreements with other Defendants should

not have access to such information. Additionally, Evolved Wireless has proposed an additional

designation of "CONFIDENTIAL- OUTSIDE COUNSEL EYES ONLY" for the production of

licenses across related cases, which would limit access to only outside counsel for the parties.

The Protective Order also limits the use of the documents produced in these cases to

these related matters and further prohibits use for business or competitive purposes. *Id.* at

§§ 1(a), 6(a). The parties' outside and in-house counsel have an ethical obligation to maintain the

confidentiality of the documents produced in this case and to abide by the provisions of the

Protective Order. Courts have rejected the argument that Defendants are pressing for here, that

counsel will not be able to fulfill their ethical obligations. For example, in *Nazomi Communs.,*

*Inc. v. ARM Holdings*, the defendant attempted to add a "negotiation bar" to the protective order

in that case based on the same assumption Defendants make here—that outside counsel will use

confidential information learned during litigation against the defendant in future endeavors,

including negotiations. *See* No. C-02-02521, 2002 U.S. Dist. LEXIS 21400, at *3 (N.D. Cal. Oct.

11, 2002). The court in *Nazomi* rejected the proposed "negotiation bar" because "the general rule

is that attorneys operating under a protective order will properly handle confidential

information." *Id.* at *11.

If Defendants truly fear that each other's outside counsel will improperly use their LTE

licenses, then the Defendants can and should separately pursue a negotiation bar against each

other. But Defendants' distrust of each other's outside counsel should not preclude the cross-

production and consideration of highly relevant LTE licenses in all the related cases.

### C.     The relevance of the LTE licenses outweighs the risk of inappropriate use.

As explained above, the licenses are relevant to these cases regardless of whether the

*Georgia-Pacific* factors are applied. The Defendants' LTE licenses are subject to the identical

FRAND considerations as the patents-in-suit and will likely play a central role in addressing not

only the royalty rate, but also the claims made by the majority of the Defendants that Evolved

Wireless allegedly breached its FRAND obligations. Cases such as *Ericsson*, *Microsoft*, and

*Innovatio* have highlighted the need for flexibility when addressing a FRAND royalty rate. This

flexibility can be assured through cross-production of the LTE licenses.

Conversely, the Protective Order entered in this case sufficiently protects the

confidentiality of the LTE licenses. The risk of improper disclosure is effectively mitigated

through strict restrictions on the scope of access and use and vigilance of counsel. This Court

should not assume that counsel will fail to abide the Protective Order or their ethical obligations.

Further, Evolved Wireless is willing to modify the Protective Order to prohibit all in-house

access of the relevant documents should the Court feel this additional protection is necessary.

As such, the potential relevance outweighs the potential risk of disclosure by a substantial

margin. Due to the high degree of relevance in comparison to the minimized burden of

production and risk of disclosure, the Court should permit cross-production of the LTE licenses.

### III. Cross-production of LTE licenses will not unreasonably expand the scope of discovery.

Cross-production of the LTE licenses will not unnecessarily expand the scope of

discovery. The terms *agreed to* by the parties to the LTE licenses, not the underlying

negotiations that led to the agreement, are relevant to determining a fair, reasonable, and non-

discriminatory royalty rate in these cases for each of the Defendants, and to help facilitate an

assessment of the value of LTE technology generally so that apportionment requirements can be

met and royalty stacking considerations can be addressed. There is no need for Defendants to

conduct additional discovery following the cross-production of licenses given that the relevant

terms are contained within the licenses themselves. Underlying negotiations are of little relevance. FRAND obligations are determined by the final terms of the agreement, not how the parties reached the agreement.

Further, Defendants argue that other LTE licenses are irrelevant to each Defendant's respective case. At the same time, Defendants argue that dozens of depositions will need to be taken to explore the purportedly irrelevant LTE licenses if they are cross-produced. Defendants cannot have it both ways. If Defendants truly believe the agreements are not relevant, they should see no need for additional discovery. To the extent discovery is expanded at all, the expansion should be limited to the terms that are agreed to in the licenses rather than the negotiations that led up the final agreement. Such limited discovery could be completed under the parameters of the Court's Scheduling Order.

Moreover, cross-production of the LTE licenses is proportional to the needs of the case in light of the relevance of the licenses. Concerns of whether discovery is proportional to the needs of the case have focused on the effort required to produce the requested discovery. *See, e.g., GlaxosmithKline LLC v. Teva Pharms. USA, Inc.,* No. 14-878-LPS, 2016 U.S. Dist. LEXIS 27910, at *3-5 (D. Del. Mar. 3, 2016) (after plaintiff explained the relevance of the requested discovery, the court acknowledged the additional burden on defendant but still ordered additional targeted searching); *Callwave Commc'ns. LLC v. AT&T Mobility LLC, et al.*, Ex. A, No. 12-1701-RGA, D.I. 599, at *1 (D. Del. June 30, 2016) ("[T]he discovery sought is relevant, and, while the efforts involved in responding are by no means insignificant, the effort is also not disproportional to the needs of the case."). Here, Defendants do not bear any additional burden if cross-production is permitted because the LTE licenses have already been produced to Evolved Wireless and Evolved Wireless would make the cross-production. And because the agreed-upon

terms, not the negotiations that led to those terms, are relevant to the FRAND analysis, little additional burden will be imposed upon cross-production of the agreements. Accordingly, Cross-production of the licenses should be ordered.

**IV.     The additional third party production agreements do not prohibit cross-production of the licenses under section 6(g) of the Protective Order.**

While Evolved Wireless has entered into additional confidentiality agreements with third parties, these agreements do not limit the scope of section 6(g) of the Protective Order and do not prevent cross-production of the LTE licenses.[9] Ex. C. These agreements were entered into by Evolved Wireless, a specific Defendant, and the third party during the initial production of the relevant LTE licenses. While the additional confidentiality agreements do impose certain obligations, these agreements do not preclude cross-production of the LTE licenses.

As an initial matter, Evolved Wireless only entered into these agreements for a small percentage of the licenses. And even for the licenses where Evolved Wireless did agree to additional confidentiality limitations, there was never an agreement to eliminate the availability of the procedure under section 6(g).

Section 6(g) explicitly starts with "[n]otwithstanding the provisions of this Protective Order," highlighting the fact that the cross-production procedure is available to Evolved Wireless despite any other provisions in the Protective Order. Moreover, section 6(g) is consistent with the Court's order to coordinate discovery. Even if section 6(g) were not in the Protective Order, Evolved Wireless could still seek disclosure under a third-party subpoena. Evolved Wireless

---

[9] To preserve confidentiality until the Court rules on this issue, Evolved Wireless has filed and served the additional confidentiality agreements relevant to each Defendant under only the appropriate case number. A single copy of this brief with all relevant agreements will be delivered under seal directly to the Court.

never agreed to waive any rights to cross-production when it entered into the additional confidentiality agreements. Indeed, no Defendant or third party ever raised section 6(g) of the Protective Order when negotiating additional protection. Thus, Evolved Wireless always maintained its right to seek to disclose materials under section 6(g) of the Protective Order.

## Conclusion

In each of these six related cases, Evolved Wireless's commitment to license the patents-in-suit under FRAND terms requires consideration of factors beyond the commercial relationship between the patentee and each respective accused infringer and beyond the licenses entered into by each accused infringer. The more data there is about the terms of other LTE licenses in the industry, the better equipped the fact finder will be to determine a fair, reasonable, and non-discriminatory rate for Evolved Wireless's patents. Indeed, courts have highlighted the importance of industry-level information related to the technical standard at issue, including rates paid by others for patents essential to the same technical standard, when determining a FRAND royalty rate. The Defendants' LTE licenses are also relevant to defending against Defendants' claims that Evolved Wireless did not satisfy its FRAND obligations.

The Defendants each took part in negotiating a Protective Order and found that it sufficiently protected their interests—including section 6(g) regarding the cross-production of confidential material—when they agreed to the terms entered by the Court. The Protective Order—with an addition of an "outside counsel only" designation—more than sufficiently protects Defendants and third parties. Evolved Wireless respectfully requests that the Court grant the cross-production of LTE licenses in the related cases.

DATED: October 21, 2016

Respectfully submitted,

**FARNAN LLP**

 /s/ Brian E. Farnan
Brian E. Farnan (Bar No. 4089)
919 N. Market Street, 12th Floor
Wilmington, Delaware 19801
(302) 777-0300
(302) 777-0301
bfarnan@farnanlaw.com

*Of Counsel:*

Christopher K. Larus (admitted pro hac vice)
Marla R. Butler (admitted pro hac vice)
Ryan M. Schultz (admitted pro hac vice)
Andrew D. Hedden (admitted pro hac vice)
Benjamen C. Linden (admitted pro hac vice)
Ryan E. Dornberger (admitted pro hac vice)
Anthony F. Schlehuber (admitted pro hac vice)
**ROBINS KAPLAN LLP**
800 LaSalle Avenue, Suite 2800
Minneapolis, Minnesota 55402
Telephone: (612) 349-8500
Facsimile: (612) 339-4181
clarus@robinskaplan.com
mbulter@robinskaplan.com
rschultz@robinskaplan.com
ahedden@robinskaplan.com
blinden@robinskaplan.com
rdornberger@robinskaplan.com
aschlehuber@robinskaplan.com

Andrea L. Gothing (admitted *pro hac vice*)
**ROBINS KAPLAN LLP**
2440 W. El Camino Real, Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
agothing@robinskaplan.com

**COUNSEL FOR PLAINTIFF EVOLVED WIRELESS, LLC**