## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EVOLVED WIRELESS, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 15-543-JFB-SRF |
| | ) | |
| v. | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| HTC CORPORATION, and HTC | ) | **PUBLIC VERSION** |
| AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

### HTC'S BRIEF IN OPPOSITION TO EVOLVED'S *DAUBERT* MOTION

OF COUNSEL:

Stephen S. Korniczky
Martin R. Bader
Ericka Schulz
Nam H. Kim
Eric K. Gill
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
(858) 720-8900

Dated:  January 12, 2018
Public version dated: January 19, 2018

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P.O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendants*
*HTC Corporation and HTC America, Inc.*

# TABLE OF CONTENTS

Page

I.    INTRODUCTION ...............................................................................................1

II.   NATURE OF THE PROCEEDINGS ..................................................................1

III.  SUMMARY OF ARGUMENT ...........................................................................1

IV.   STATEMENT OF FACTS ...................................................................................2

    A.    Dr. Gregory Leonard ...............................................................................2

    B.    Non-Infringing Alternatives Analysis.....................................................3

    C.    ETSI Intellectual Property Licensing Obligation ...................................4

V.    ARGUMENT .......................................................................................................6

    A.    Dr. Leonard .............................................................................................6

        1.    Relying on a Portfolio's Purchase Price Is A Legally Accepted
            Method for Determining a Royalty Rate. ....................................6

        2.    Determining a Royalty Rate Using Non-Infringing Alternatives to
            the Accused Product Available Prior to Standardization Is Legally
            Acceptable And Reliable. ............................................................9

        3.    Ericsson v. D-Link and Innovatio Require application of Ex Ante
            Hypothetical Negotiation—but Ex Post Facts May be Considered...........12

        4.    Dr. Leonard Applies the ████████ Agreement To The Facts
            of The Case, and Does Not Interpret the Meaning of Any Terms..............13

    B.    Dr. Rudi Bekkers. ................................................................................13

        1.    Dr. Bekkers's Discussion of Opportunistic Behaviors Is Relevant
            to Determining a FRAND Royalty Rate.....................................14

        2.    Dr. Bekkers's Explanation Regarding the Process Behind
            Establishing The ETSI IPR Policy Is Connected To Evolved's
            FRAND Obligation....................................................................15

        3.    Patent Pledges by Industry Leaders are Relevant to What the
            Industry Considered was a FRAND Royalty Rate Prior to
            Adopting the Standard. ..............................................................16

        4.    Disclosure Obligations Are Relevant to Understanding How Over
            Declaration in ETSI Affects Dr. Putnam's FRAND Rates
            Calculation. ...............................................................................16

    C.    Dr. Apostolos Kakaes. .........................................................................16

        1.    Dr. Kakaes Identified Non-infringing Alternatives Available at the
            Time of Adoption of the Standard Pursuant to Federal Circuit
            Precedent For Determining an Incremental Benefit Of the Patented
            Technology. ...............................................................................16

2.     Dr. Kakaes Provide Sufficient Motivation Why Prior Art Would be Combined, Where Such Analysis Goes to The Weight Not Admissibility of His Testimony ................................................................... 19

VI.    CONCLUSION ................................................................................................................. 20

## TABLE OF AUTHORITIES

Page(s)

Cases

*Apple Inc. v. Motorola, Inc.*
   757 F.3d 1286 (Fed. Cir. 2014)............................................................................11

*Apple, Inc. v. Samsung Elecs. Co., Ltd.*
   2014 U.S. Dist. LEXIS 24506 (N.D. Cal. Fe. 25, 2014) ..........................................9

*Astrazeneca AB v. Apotex Corp.*
   782 F.3d 1324 (Fed. Cir. 2015)......................................................................10, 18

*Audio MPEG, Inc. v. Dell, Inc.*
   No. 2:15cv73, 2017 U.S. Dist. LEXIS 166459 (E.D. Va. Oct. 6, 2017) ..............10, 12, 17, 18

*Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*
   2017 U.S. Dist. LEXIS 115373 (E.D. Pa. July 24, 2017)......................................15

*Daubert. Masimo Corp. v. Philips Elec. N Am. Corp.*
   62 F. Supp. 3d 368 (D. Del. 2014)................................................................1, 6, 11

*Daubert v. Merrell Dow Pharms., Inc.*
   509 U.S. 579 (1993)...........................................................................................20

*Ericsson, Inc. v. D-Link Sys.*
   773 F.3d 1201 (Fed. Cir. 2014)............................................9, 10, 12, 17, 18, 19

*Garretson v. Clark*
   111 U.S. 120 (1884).............................................................................................9

*Grain Processing Corp. v. American Maize-Product Co.*
   185 F.3d 1341 (Fed. Cir. 1999)...........................................................................19

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*
   378 F. Supp. 2d 459 (D. Del. 2005).....................................................................12

*i4i Ltd. P'ship v. Microsoft Corp.*
   598 F.3d 831 (Fed. Cir. 2010).........................................................................6, 20

*In re Innovatio IP Ventures, LLC,*
   Case 2013 U.S. Dist. LEXIS 144061 (N.D. Ill. Sep. 27, 2013)..................8, 10, 11, 12, 17, 19

*Intel Corp. v. Future Link Sys., LLC*
   No. 14-377-LPS, 2017 U.S. Dist. LEXIS 91699 (D. Del. June 1, 2017) ..................10, 11, 18

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*
   688 F.3d 1342 (Fed. Cir. 2012)...........................................................................20

*LaserDynmics, Inc., v. Quanta Comput. Inc.*
    No. 2:06-cv-348, 2011 U.S. Dist. LEXIS 5422 (E.D. Tex. Jan, 2011) ...................................19

*Microsoft v. Motorola*
    No. C10-1823-JLR, 2013 WL 2111217, at *13 (W.D. Wash. Apr. 25, 2013).................10, 18

*ResqNet.com, Inc. v. Lansa, Inc.*
    594 F. 3d 860 (Fed. Cir. 2010)...............................................................................................12

*Riles v. Shell Exploration & Prod. Co.*
    298 F.3d 1302 (Fed. Cir. 2002)......................................................................................10, 18

*Robocast, Inc. v. Microsoft Corp.*
    No. CV 10-1055-RGA, 2014 WL 202399, at *2 (D. Del. Jan. 16, 2014) ...............................7

*Schonfeld v. Hilliard*
    218 F.3d 164 (2d Cir. 2000)......................................................................................................6

*Scrofani v. Stihl Inc.*
    44 Fed. Appx. 559, 562 (3rd Cir. 2002)..................................................................................15

*Smith v. Ford Motor Co.*
    215 F.3d 713 (7th Cir. 2000) ..................................................................................................13

*Summit 6, LLC v. Samsung Elecs. Co.*
    802 F.3d 1283 (Fed. Cir. 2015).....................................................................................6, 10, 18

*In re TMI Litig.*
    193 F.3d 613 (3d Cir. 1999)....................................................................................................13

*Triangle Waist v. Todd*
    119 N.E. 85 (N.Y. 1918) (Cardozo, J.) .....................................................................................7

*United States v. Ford*
    481 F.3d 215 (3d Cir. 2007).....................................................................................................13

## I.      INTRODUCTION

HTC Corporation and HTC America, Inc. ("HTC") respectfully submit this answering brief in opposition to Evolved Wireless, LLC's ("Evolved") *Daubert* Motion.  For the reasons set forth below, Evolved's motion should be denied, as each challenge goes to the weight of the expert's testimony, and not to its admissibility.

## II.     NATURE OF THE PROCEEDINGS

Evolved's statement of the nature and stage of the proceedings is generally accurate. (*See* D.I. 291 at 1.)  However, Evolved omits that on June 30, 2017, four days after the non-infringement expert reports were served, Evolved sought to dismiss three of the original five patents-in-suit, U.S. Patent Nos. 7,746,916, 7,768,965, and 8,218,481 from the case, without explanation and at significant and unnecessary cost to HTC.  *See* D.I. 178.

## III.    SUMMARY OF ARGUMENT

1.  Dr. Gregory Leonard's opinions are founded on solid legal precedent and reliable methodology.  Evolved attempts to challenge certain aspects of Dr. Leonard's opinions by framing it as an issue of reliability.  In reality, however, the issues are factual disputes, which go to the weight of his testimony, and not admissibility.  For example, precedent supports Dr. Leonard's use of the purchase price of a patent portfolio, and *ex ante* non-infringing alternatives to determine a royalty rate.  Additionally, Dr. Leonard is not interpreting the ██████████ agreement, but instead applying his understanding of the terms, which may change if the Court provides a different interpretation.

2.  Dr. Rudi Bekkers bases his opinions on the ETSI IPR policy on exhaustive amounts of research, which has been thoroughly vetted by peer-reviewed publications.  Moreover, his opinions specifically relate to central issues in the case:  Evolved's FRAND obligations, its

breach of FRAND obligations, and calculation of a FRAND rate and damages.  Thus, Dr. Bekkers's opinions challenged by Evolved are relevant to this case.

3.  Dr. Apostolos Kakaes analyzes non-infringing alternatives, available in the public domain prior to standardization—which is the properly timed inquiry.  Dr. Kakaes determines the alternatives were equally efficient to replace the patented technology, and was properly relied on by Dr. Leonard to determine the *ex ante* incremental value of the patented technology. Moreover, the sufficiency of the "motivations to combine" Dr. Kakaes provided in his invalidity analysis is a factual dispute, which goes to the weight of the testimony, not admissibility.

## IV.   STATEMENT OF FACTS

### A.   Dr. Gregory Leonard

Dr. Leonard opines that Evolved's offer of $0.25 for its five family patent portfolio was not fair, reasonable and non-discriminatory ("FRAND") under ETSI's IPR Policy.  (*See* D.I. 292, Ex. 1 ¶¶ 71 and 79.)  Dr. Leonard comes to this opinion three ways.  First, at $0.05 per patent family, the implied aggregate royalty burden for the LTE standard across all actually essential patents is approximately $255, which is far greater than the average selling price of ████████ ██████████) or ██████████████████ and thus cannot be FRAND.  (*Id.*, ¶¶ 68-71.)

Second, using the patent portfolio's valuation as determined by the prior owner TQ Lamda, Dr. Leonard determined a royalty rate from a "present discounted value of a reasonable expected cash flow" that the investment should generate in the future.  (*Id.* ¶¶ 72-79.)  Dr. Leonard determined an upper bound royalty rate for the entire portfolio by taking into account various risks of enforcement, and an estimate of the potential licensed products (excluding LG sales to account for the grant-back license).  (*Id.*)  Dr. Leonard determined a reasonable rate for the portfolio of $0.0138—far less than Evolved's offer.

Third, Dr. Leonard compared to the amount of revenue a royalty rate of $0.25 per device would bring Evolved over the life of the patents—which equated to a present value of $598 million of profit. (*Id.* ¶¶ 80-82.) After accounting for operating costs and taxes, he determined Evolved would receive an economically implausible 86% annual return. (*Id.*)

In his rebuttal report, Dr. Leonard determined the portfolio's FRAND rate two ways. First, he applied a "bottom-up" approach by determining the incremental economic value of the alleged patented technology as compared to the next best non-infringing alternatives available at the time of standardization. (D.I. 292, Ex. 3 ¶¶ 11, 107-109, 123-144.) Second, Dr. Leonard rebutted Dr. Putnam's Top Down approach by adjusting for improper assumptions and calculations made by Dr. Putnam. (*Id.* ¶¶103-106.)

## B. Non-Infringing Alternatives Analysis

To perform the "bottom up" analysis, Dr. Leonard relied on Dr. Kakaes and Dr. Anthony Acampora's technical analysis comparing the patented technology's key claimed feature to non-infringing alternatives available prior to setting the LTE standard. (*See e.g.,* D.I. 292, Ex. 3 ¶¶ 128-134.) Drs. Kakaes and Acampora provided extensive detailed reports, totaling about 100 pages each, detailing a number of reasons why the alternatives were acceptable, if not better than the patented technology. (*See e.g.,* D.I. 292, Ex. 7 ¶¶ 182-209 and 236-246.) Accordingly, Dr. Kakaes determined there was no meaningful technological advantages for the '236 and '373 patented technology over their alternatives. (D.I. 292, Ex. 3 ¶¶ 130 and 131.) Dr. Acampora found there would be no net negative impact on other related functionalities of the LTE standard if the '916, '965 and '481 were replaced with alternatives. (*Id.* ¶¶ 133 and 134.)

Next, Drs. Kakaes and Acampora searched for the alternatives in patents assigned to either LG or the developers of the non-infringing alternatives—for which they found none. (*See*

*e.g.,* Ex. 7 ¶ 181, 235.)  This demonstrates that the alternatives are in the public domain, and no royalties would be due for using them.  Additionally, HTC's source code expert, Dr. Benjamin Goldberg determined the incremental engineering effort to implement the alternatives in the accused products, which Dr. Leonard used to determine the associated costs for these efforts and any additional costs related to the alternatives.  (D.I. 292, Ex. 3 ¶¶ 127, 137-144.)  Dr. Leonard then recreated a hypothetical negotiation, where "[i]n this case, the negotiation would have centered on the savings created by avoiding the low cost to design around LG's/EW's patents-in- suit." (*Id.* ¶ 144.)  Using the data gathered by the technical experts, Dr. Leonard determined that 0.011 cents is a reasonable royalty for the five patents-in-suit.  (*Id.* ¶ 11, 143.)

### C.    ETSI Intellectual Property Licensing Obligation

The parties agree, that the patents-in-suit have been declared essential to the mobile wireless LTE standard adopted by the European Telecommunications Standards Institute ("ETSI").  (D.I. 291 at 1.)  The parties disagree, however, over what the patent owner's obligations are under the ETSI Intellectual Property Right ("IPR") policy to license declared standard essential patents ("SEP's") to the LTE standard.  Evolved's witness, Dr. Bertrand Huber, admits that "[f]or the correct interpretation of such ["IPR"] policy, it is important to have a close look at the debates and deliberations leading up to the adoption of the ETSI IPR Policy in November 1994."  (Declaration of Martin R. Bader ("Bader Decl."), Ex. A, at 14.)

HTC's expert, Dr. Rudi Bekkers, provided an expert report describing the circumstances surrounding the adoption of the ETSI IPR Policy, based on multiple commissioned studies he performed relating to mobile telecommunications standardization including:

- [Two] large-scale study on patents and standards commissioned by the European Commission (DG Enterprise and Competition), . . . published in 2010 [and 2013].
- A study for the US National Academy of Sciences (NAS) on commonalities and differences between SDOs' IPR policies, . . . published in 2012.

- Several studies for SDOs, including ETSI (a study of the needs and expectations of its members), the ITU (various activities including a handbook on patents, competition and standardization), IEEE (invitation by their Board to reflect on possible improvements in their IPR policy), and support for policy organizations in the field of standards, including the OECD and the Dutch government.

(D.I. 292, Ex. 5 at 2 (footnotes omitted.))  This research supports Dr. Bekker's opinion that:

> Even though a FRAND commitment means that the patent owner does agree to certain restrictions in its freedom regarding the licensing of the patent (it can no longer refuse to license, to license the patent at higher than fair and reasonable fees, and cannot discriminate among licensees, among others), companies still regard owning SEP and making that commitment as much more attractive than not making that commitment and thus not owning that SEP . . . .

(*Id.* at 15.)  Dr. Bekkers also described in his report the importance of "over-disclosure and under disclosure," "possible opportunistic behavior when disclosing essential patents," "why firms seek SEP ownership," and "firm strategies to obtain SEP ownership" in his report.  (*Id.* at 18.)

Evolved's witness, Dr. Bertrand Fages, provided a contradictory opinion in his report:

> [I]n and of itself, the [ETSI IPR] undertaking does not create an obligation to carry out successfully the licensing negotiations or to reach an agreement at all costs (such as on terms that would not adequately and fairly reward the IPR owner for the use of its inventions).

(Bader Decl., Ex. B, ¶ 84.)

One specific disagreement between the parties is the number of actually essential patents in the LTE standard versus the number declared.  The discrepancy is created by a well-known problem of over-declaring patents.  Evolved's witness, Dr. Putnam explains:

> ETSI rules only request the disclosure of patents that "may be, or may become" essential to the standard. For that reason, there is no agreed upon identification or count of patents that are *actually* essential to the LTE standard. Instead, the actual essentiality of patents in a portfolio of potentially essential patents is often the subject of disagreement in bilateral negotiations. To infer the number of patent families that are actually essential to the LTE standard, I consult a number of publicly available studies by technical experts. These studies are notable for their own disagreement as to the proportion of disclosed essential patent families that should be judged essential. ***In fact, their disagreements are statistically significant more than 50% of the time***.

5

(Bader Decl., Ex. C, ¶ 180.)  Using these studies, Dr. Putnam conjured up a number of "actually essential patents" (38.5%) to determine a royalty rate for Evolved's patents.  (*Id.* ¶¶ 175-182.)

## V.    ARGUMENT

Where there is a logical basis for the expert's opinion testimony, it is admissible under *Masimo Corp. v. Philips Elec. N Am. Corp.*, 62 F. Supp. 3d 368, 388 (D. Del. 2014). "The weight and credibility of an expert's testimony may be challenged through '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596 (1993)). "[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role of the court is satisfied, and the inquiry on the correctness of the methodology and of the results produced thereunder belongs to the factfinder." *Summit 6, LLC v. Samsung Elecs. Co.,* 802 F.3d 1283, 1296 (Fed. Cir. 2015); *see also i4i Ltd. P'ship v. Microsoft Corp.,* 598 F.3d 831, 852 (Fed. Cir. 2010).

### A.    Dr. Leonard

#### 1.    Relying on a Portfolio's Purchase Price Is A Legally Accepted Method for Determining a Royalty Rate.

Dr. Leonard determined an "upper bound" FRAND royalty rate for Evolved's portfolio based on the well-known economic principle that "the value of an asset is equal to the present discounted value of the cash flows the asset is expected to generate in the future."  (D.I. 292, Ex. 1 ¶ 62, n. 81; *see also* ¶ 72-79, n. 101.)

Courts have long considered concrete evidence of market transactions as reliable evidence of value.  *See, e.g.*, *Schonfeld v. Hilliard*, 218 F.3d 164, 179 (2d Cir. 2000) ("Indeed, it is well-established that a recent sale price for the subject asset, negotiated by parties at arm's length, is the "best evidence" of its market value."); *Triangle Waist v. Todd*, 119 N.E. 85 (N.Y.

1918) (Cardozo, J.) ("If one agrees to sell something to another, and then, the next day, sells it to some one else at an advance. . . . [t]he price received upon a genuine sale either of property or of services is some evidence of value.").

In *Robocast, Inc. v. Microsoft Corp.*, the Court allowed the use of a patent owner's valuation and/or sale of a patent to determine a reasonable royalty rate, because

> an outright sale of patent rights . . . represents the maximum value someone was willing to pay for the technology, [and] [i]f anything, . . . overstates the value which [patent owner] would place on a license for comparable technology.

No. CV 10-1055-RGA, 2014 WL 202399, at *2 (D. Del. Jan. 16, 2014). Although there was a question as to what "discount" should be applied to the valuation due to potential risk of invalidity, the *Robocast* Court left this questions for the jury and cross examination. *Id.* at *3.

Here, Evolved wrongly complains[1] that certain factors, such ███████████████ ███████ were left out of Dr. Leonard's analysis. The factors that Evolved alleges Dr. Leonard ignored (idiosyncratic risks and the value of the grant-back license), were in fact accounted for in Dr. Leonard's analysis. Dr. Leonard opined that "the implied royalty rate is the rate that would result in licensing revenues that, after deducting applicable costs and taking into account *risk*, yields a ██████████████████ for the portfolio." (*Id.* ¶ 75 (emphasis added).)[2] Moreover, Dr.

---

[1] Evolved openly admits that Dr. Leonard's methodology applies facts that are sufficiently tied to the facts of this case: the purchase price of a portfolio that includes the patents-in-suit; the valuation by TQ Lambda; the potential licensed products and licensable market (tailored to include the Defendants, but excluded LG and Sony); a license term that included the full term of the patents-in-suit; potential licensing expenses (tailored for the number of patents in Evolved's portfolio); taxes; and discount rates. (D.I. 292, Ex. 1 ¶¶ 72-79.)

[2] Evolved provides no evidence to show HTC failed to consider relevant factors. For example, when asked how the ████████████ was determined, Evolved's representative testified ███████████████████████████████████████████████ (Bader Decl. __ [[Devine depo]] at Tr. 233:6-236:11; 388:17-24; 393:9-394:6.) Therefore, there is no reason to believe this valuation did not already include the ████████████ nd the risks associated with enforcing the acquired patents, or that the value was necessarily discounted for the risk of litigation or that the patents could not be successfully monetized. Evolved cannot argue Defendants methods are unreliable

Leonard accounted for ███████████████████████████████ in addition to a number of other encumbrances.  (*Id.* at 44 n. 119 ████████████ ████████████████████████████████████████ ████████████.”))

Moreover, the **extent** to which Dr. Leonard included such factors in his calculation cannot be a basis to exclude Dr. Leonard's testimony because these factual disputes go to the weight of the testimony, not its admissibility.  *See Robocast, Inc.*, 2014 WL 202399, at *2–3 (declining to exclude a valuation relied upon by expert because "it is up to the jury to determine the weight accorded the valuation.").

Evolved's reliance on *In re Innovatio IP Ventures, LLC*, is misplaced.  Case No. 11 C 9308, 2013 U.S. Dist. LEXIS 144061 (N.D. Ill. Sep. 27, 2013).  Unlike *Innovatio,* in this case the purchased portfolio was the same portfolio Evolved offered to license to HTC for $0.25 per device.  (D.I. 292, Ex. 2.)  The *Innovatio* patent sale appears to have involved an unknown number of additional patents unrelated to the FRAND dispute.  *See id*. at *139-41 ("As a practical matter, however, neither party offered an effective means of isolating the value of a license for the twenty-three patents from the rest of the transaction.").  While the *Innovatio* court ultimately decided not to rely on the purchase price of the patents in determining a FRAND royalty, it did so after considering confidential evidence concerning the purchase agreement that is redacted from the public opinion.  *See, e.g., id*. at *140 ("[TEXT REDACTED BY THE COURT] (*See id*. at 134:7-10 explaining that Broadcom [TEXT REDACTED BY THE COURT].)")  The redactions in the opinion leave it unclear how many other patents, or even whether other considerations were part of "the rest of the transaction."  While the *Innovatio* court

---

when Evolved refused to provide such information.

also noted the potential that the price reflected "a significant discount for the risk that the patents could not be successfully monetized," *id*. at 140, this determination appears to heavily relate to the redacted confidential information—and a comparison cannot be made here.

Likewise, Evolved's reliance on *Apple, Inc. v. Samsung Elecs. Co., Ltd.,* 2014 U.S. Dist. LEXIS 24506, at *33-34 (N.D. Cal. Fe. 25, 2014) is inapposite.  In *Apple,* the court rejected use of a license agreement as not "comparable" in a hypothetical negotiation due to the broad portfolio, worldwide settlement, and anti-cloning clauses—not because the expert merely failed to consider the value of the grant back clause.  *Id.* at *32-34.  In this case, the minor factual disputes as to the ***extent*** that the "risks" and grant-back license were accounted for go to the weight of the testimony, and not its admissibility, and this opinion should not be excluded.

### 2. Determining a Royalty Rate Using Non-Infringing Alternatives to the Accused Product Available Prior to Standardization Is Legally Acceptable And Reliable.

The Federal Circuit confirmed that when a patent essential to a standard claims only a portion of a "new machine or contrivance," "Supreme Court precedent . . . requires apportionment of the value of the patented technology from the value of its standardization." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014) (applying *Garretson v. Clark,* 111 U.S. 120, 121 (1884).  Thus, "the patent holder should only be compensated for the approximate incremental benefit derived from his invention[,]" and, it is vital to apportion out both (1) "the patented feature . . . from all of the unpatented features reflected in the standard[,]" and (2) "any value added by the standard's adoption of the patented technology."  *Id.*

Moreover, "[i]f the patents are essential to a standard issued by a standard setting organization, then the hypothetical negotiation date is set prior to the adoption of the standard, in order to exclude from a royalty any value derived from the patent's relationship with the standard."  *Audio MPEG, Inc. v. Dell, Inc.,* No. 2:15cv73, 2017 U.S. Dist. LEXIS 166459, at *10

(E.D. Va. Oct. 6, 2017) (citing *D-Link Sys., Inc.*, 773 F.3d at 1232-34.); *see also Innovatio*, 2013 U.S. Dist. LEXIS 144061 at *163 (determining a RAND rate using "a hypothetical ex ante negotiation [that the parties] most likely would have agreed upon . . . before Innovatio's patents were adopted into the standard.").

Both the Federal Circuit and this district have found acceptable the method of determining the incremental benefit derived from an invention by comparing the accused product to non-infringing alternatives.  *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015); *see also Intel Corp. v. Future Link Sys., LLC*, No. 14-377-LPS, 2017 U.S. Dist. LEXIS 91699, at *7 (D. Del. June 1, 2017).  "When an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low." *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir. 2015) (citing *Grain Processing*, 185 F.3d at 1347; *Riles v. Shell Exploration & Prod. Co*., 298 F.3d 1302, 1312 (Fed. Cir. 2002) ("The economic relationship between the patented method and non-infringing alternative methods, of necessity, would limit the hypothetical negotiation.").

In determining a FRAND royalty in *Microsoft v. Motorola*, the district court explained how alternatives can separate out the value (if any) of a patent's technical contribution:

> If alternatives available to the patented technology would have provided the same or similar technical contribution to the standard, the actual value provided by the patented technology is its incremental contribution.  [Citation omitted].  Thus, comparison of the patented technology to the alternatives that the SSO could have written into the standard is a consideration in determining a RAND royalty.

No. C10-1823-JLR, 2013 WL 2111217, at *13 (W.D. Wash. Apr. 25, 2013).

Given the teachings of *D-Link* and other authority, Dr. Leonard determined "a FRAND royalty should be commensurate with the economic value of the patented technology relative to the next best alternative technology that was available prior to the standard being set."  (D.I. 292, Ex. 3 ¶ 124.)  This methodology is considered a "Bottom Up" approach.

Relying on *Innovatio,* 2013 U.S. Dist. LEXIS 144061, Evolved argues Dr. Leonard's bottom up approach in this case should be excluded due to alleged "mistakes."  (D.I. 291 at 6-7.) However, the court in *Innovatio* did not ***exclude*** Dr. Leonard's bottom up approach as unreliable under *Daubert.  Id.* at *160-163.  Instead, the *Innovatio* court, as a fact finder, opted to use another method, finding (1) the analysis was too complex for the court to apply, (2) the alternatives were insufficient, and (3) insufficient evidence existed to address potential royalties for the alternatives.  *Id.*  These factors were all sufficiently accounted for in Dr. Leonard's opinion and, in any event, go to the weight of the evidence, not its admissibility.

First, although the analysis in this case may be complex, Drs. Kakaes, Acampora, and Leonard provide sufficient detailed analysis to walk the court or jury through the methodology. (*See e.g.,* D.I. 292, Ex. 7).  Second, Drs. Kakaes and Acampora provide detailed analysis of how the patented technology could be replaced in the accused product, showing that the alternatives are more than sufficient.  (*See e.g. id.* ¶¶ 122-162, 182-194, 236-245, 203-215.)  Third, Drs. Kakaes and Acampora provide sufficient detail to show the alternatives were likely part of the public domain (*i.e.,* not covered by a patent), thereby obviating the need to account for royalties for using the alternatives. (*Id.* ¶¶ 181, 235.)  Nevertheless, Evolved argues Dr. Leonard should have avoided a "hard to implement" method in favor for an alternative method.  However, "[s]imply because other reliable methods of estimating a reasonable royalty may exist does not, by itself, render [an expert's] approach inadmissible."  *See Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1319 (Fed. Cir. 2014).  Moreover, any "mistakes" Dr. Leonard may have made go to the weight, not admissibility, of his testimony.  Accordingly, Evolved's request should be denied.

**3.** ***Ericsson v. D-Link* and *Innovatio* Require Application of *Ex Ante* Hypothetical Negotiation—but *Ex Post* Facts May be Considered.**

Evolved suggests "Dr. Leonard's *ex ante* opinion should be excluded" as "contrary to Federal Circuit precedent." (D.I. 291 at 8.) However, this assertion is belied by not only the *D-Link* case analyzed in Sections V.A.2 and V.C.1, but, by the very same precedent on which Evolved heavily relies, *Innovatio,* which adopted Dr. Leonard's opinion that:

> the hypothetical negotiation must take place in the *ex ante* world, before the patents were incorporated into the standard and without taking into account the success of the standard . . . to avoid capturing the value of the standard itself in the royalty resulting from the hypothetical negotiation. [This is] necessary to avoid capturing the value of the standard itself in the royalty resulting from the hypothetical negotiation, rather than just the value of the underlying technology in the asserted patents.

2013 U.S. Dist. LEXIS 144061, *172-173. An *ex ante* analysis is required by law in a standard essential patent setting. *D-Link*, 773 F.3d at 1232-34. Nevertheless, while the cases cited by Evolved support the contention that *ex post* facts may be considered under the "book of wisdom" approach, they do not hold that an *ex ante* analysis is prohibited. *See ResqNet.com, Inc. v. Lansa, Inc.,* 594 F. 3d 860, 872 (Fed. Cir. 2010); *Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459 (D. Del. 2005).

Unlike HTC's experts, and contrary to Federal Circuit precedent, Evolved's expert, Dr. Putnam, improperly used *ex post* factors to determine a royalty, and failed to "exclude from a royalty any value derived from the patent's relationship with the standard." *See Audio MPEG, Inc.*, 2017 U.S. Dist. LEXIS 166459, at *10 (citing *D-Link Sys., Inc.*, 773 F.3d at 1232-34.) Most of Dr. Leonard's use of *ex post* factors is either to correct Dr. Putnam's analysis (which goes to weight, not admissibility), or to apply a "book of wisdom" analysis. None of the *ex post* analyses contradicts Dr. Leonard's *ex ante* analysis, nor are they unreliable in view of Dr. Putnam's analysis. Thus, Evolved's motion should be denied.

**4.     Dr. Leonard Applies the ▮▮▮▮▮▮▮ Agreement To The Facts of The Case, and Does Not Interpret the Meaning of Any Terms.**

The interpretation of the ▮▮▮▮▮▮▮ license agreement is undisputedly a question of law.  Evolved complains of Dr. Leonard's application of the ▮▮▮▮▮▮▮ license agreement.  (D.I. 291 at 9-10.)  Outside of parroting the exact language of the ▮▮▮ ▮▮▮▮▮ agreement, Dr. Leonard states a series of "understandings" of the agreement and its amendments—which is ▮▮▮▮▮▮▮.  (D.I. 292, Ex. 3 ¶¶ 176-194.)  These "understandings" alert the audience that he is indeed not interpreting the language of the contract, but instead applying his understanding of the contract.  (*Id.* ¶¶ 189-194.)  Dr. Leonard is not interpreting the agreements himself, nor providing a legal conclusion about what the contract means.  (*Id.*)  If the Court interprets the contract to mean something different then what Dr. Leonard "understands," then Dr. Leonard will necessarily need to adjust his application of the agreement's terms and conditions.  Therefore, because Dr. Leonard is not providing a legal conclusion, Evolved's motion should be denied.

**B.     Dr. Rudi Bekkers.**

Evolved complains that Dr. Bekkers's opinions do not "fit" the issues in this case, or that they are irrelevant.  (D.I. 291 at 10-13.)  However, if there is "a connection between the expert opinion offered and the particular disputed factual issues in the case," then it is relevant to the case.  *In re TMI Litig.*, 193 F.3d 613, 670 (3d Cir. 1999) (citing *In re Paoli Railroad Yard PCB Litig.*, 35 F.3d 717, 743 (3d Cir. 1994)).  The Third Circuit has also emphasized that the standard for this factor "is not that high." *United States v. Ford*, 481 F.3d 215, 219 (3d Cir. 2007).  Moreover, "[w]here an expert's hypothetical explanation of the possible or probable causes of an event would aid the jury in its deliberations, that testimony satisfies *Daubert's* relevancy requirement." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000).

13

Dr. Bekkers performed numerous comprehensive studies regarding the standardization of mobile telecommunication technology, not of just ETSI, but of a number of different standardization organizations.  (D.I. 292, Ex. 5 at 2.)  His testimony is substantiated by these studies, which were reviewed by his peers in the numerous papers he published.  (*Id.* at 1.)  His opinions are far from speculative, and Evolved has failed to articulate otherwise.  Thus, because Dr. Bekkers's testimony provides insight to the jury on a number of issues, including Evolved's FRAND obligation, Evolved's breach of its FRAND obligation, and determining a FRAND rate. His testimony is relevant to this case, and thus, is admissible.

### 1.  Dr. Bekkers's Discussion of Opportunistic Behaviors Is Relevant to Determining a FRAND Royalty Rate.

As described above, there is a question of fact as to the total number of actually essential patents, as compared to the number that have been declared essential.  (*See* Bader Decl., Ex. C ¶ 180.)  Consequently, Dr. Putnam opines on the number of actually essential patents, and used that number to determine what a FRAND rate would be for the patents-in-suit.  (*Id.* ¶ 240.)  Dr. Bekkers's opinions regarding the opportunistic behaviors of patent owners over declaring patents essential to the standard is helpful to the jury when they consider whether Dr. Putnam's opinion of the number of over-declared patents is correct.  This is particular true give Dr. Putnam's admission that the independent industry studies' "disagreements are statistically significant more than 50% of the time."  (*Id.* ¶ 180.)

Evolved is worried such testimony will lead a jury to conclude that Evolved or LGE has engaged in these behaviors.  But, there is in fact proof that LGE and/or Evolved has engaged in such behavior, as Evolved withdrew three out of the five asserted patents more than halfway through this litigation—presumably because such patents were in fact not essential, which is the very definition of "over-declared."

14

Furthermore, the cases Evolved relies on are distinguishable from this case.  For example, in *Scrofani v. Stihl Inc*., the court found the expert's opinions were not based upon sufficient data or reliable methods, in fact he "employed absolutely no methodology at all and merely [set] forth a series of unsubstantiated opinions."  44 Fed. Appx. 559, 562 (3rd Cir. 2002).  In *Ctr. City Periodontists, P.C.*, the court did not allow a "regulatory expert's testimony in support of a breach of warranty or breach of contract claim," as the claim had nothing to do with the government regulations.  *Ctr. City Periodontists, P.C. v. Dentsply Int'l, Inc.*, 2017 U.S. Dist. LEXIS 115373, *17 (E.D. Pa. July 24, 2017).  The other cases relied on by Evolved can likewise distinguishable based on the facts of this case.

> **2.     Dr. Bekkers's Explanation Regarding the Process Behind Establishing The ETSI IPR Policy Is Connected To Evolved's FRAND Obligation.**

As expressed by Evolved's witness, the "debates and deliberations leading up to the adoption of the ETSI IPR Policy" are important.  (Bader Decl, Ex. A at 14.)  As such, Dr. Bekkers's belief, after significant research, that the ETSI decision structure regarding its IPR policy leaves top implementers underrepresented is signficant.  (D.I. 292, Ex. 5 at 34.)  The jury can contrast Dr. Bekkers's opinion with those of Dr. Huber, who, for example, opined that the

> ETSI IPR Policy aims at . . . establishing a balance between the needs of standardization for public use and the rights of the owners of IPRs, and adequately and fairly rewarding the owners of the IPRs in the course of the implementation standards.

(Bader Decl., Ex. __ at 18.)  Dr. Bekkers's opinions are relevant to the question of fact as to what the ETSI IPR Policy is meant to accomplish and should *not* be excluded.

3.      **Patent Pledges by Industry Leaders are Relevant to What the Industry Considered was a FRAND Royalty Rate Prior to Adopting the Standard.**

Dr. Bekkers's analysis of the patent pledges by industry leaders is important to determining the FRAND royalty rate.  For example, Dr. Leonard uses the industry's maximum patent pledge of a 10% burden to determine the aggregate royalty burden on an average priced phone of $211—which equates to $21.  (D.I. 292, Ex. 1 ¶ 70.)  Dr. Leonard opines that the "aggregate royalty burden implied by EW's offer far exceeds these ex-ante expectations of the aggregate royalty burdens."  (*Id.*)  This pledge was consistent industry wide, regardless of whether LGE "agreed" with it.  LGE continued to contribute to the standard and declare patents essential to it, knowing what the industry wide rate was likely to be.  Therefore, Evolved provides no reason why the jury could not consider this fact in its deliberation on what the FRAND rate should be, and Evolved likewise provides no basis to exclude the testimony.

4.      **Disclosure Obligations Are Relevant to Understanding How Over Declaration in ETSI Affects Dr. Putnam's FRAND Rates Calculation.**

For the same reasons discussed in section V.B.1, ETSI's disclosure obligations, and the affect it had on an over-declaration of patents, directly rates to Dr. Putnam's FRAND rate calculation, which directly relies on the number of actually essential patents.  Thus, such testimony is relevant to the case at hand, and should not be excluded.

C.      **Dr. Apostolos Kakaes.**

1.      **Dr. Kakaes Identified Non-infringing Alternatives Available at the Time of Adoption of the Standard Pursuant to Federal Circuit Precedent For Determining an Incremental Benefit Of the Patented Technology.**

To support Dr. Leonard's incremental value analysis, Dr. Kakaes identified and analyzed a number of non-infringing alternatives to the key claimed features in the '276 and '373 patents.  (D.I. 292, Ex. 7.)  All but one of these alternatives were presented to the ETSI working group prior to the patented technology being adopted into the standard.  (*See e.g. Id.* ¶¶ 4, 10, 13, 17,

119, 121, 122-25, 127, 130, 132, 139-42, 155, 160-61, 177, 179, 198-200, 217, 226 and 233.)

Evolved argues the analysis was improper because Dr. Kakaes did not show that the alternatives

were available during the time of infringement.  However, this argument does not apply to the

SEP context.

The Federal Circuit recognizes that "[w]hen a technology is incorporated into a standard,

it is typically chosen from among different options . . . [and once adopted,] is not always used

because it is the best or the only option [, but because] it is necessary to comply with the

standard."  *D-Link Sys.*, 773 F.3d at 1233.  These circumstances require a unique analysis of the

value of SEP.  For example, in the SEP context, "the hypothetical negotiation date is set prior to

the adoption of the standard, in order to exclude from a royalty any value derived from the

patent's relationship with the standard."  *Audio MPEG, Inc. v. Dell, Inc.,* No. 2:15cv73, 2017

U.S. Dist. LEXIS 166459, at *10 (E.D. Va. Oct. 6, 2017) (citing *D-Link Sys., Inc.*, 773 F.3d at

1232-34); *see also Innovatio*, 2013 U.S. Dist. LEXIS 144061 at *138-139, 163 (determining a

RAND rate using a hypothetical ex ante negotiation date "before Innovatio's patents were

adopted into the standard" and reviewing alternatives available at the time of standardization).

Additionally, courts have applied a modified set of Georgia Pacific factors for evaluating

a hypothetical negotiation in the SEP setting.  *Innovatio*, 2013 U.S. Dist. LEXIS 144061, at *52.

One of the modified Georgia Pacific factors requires analysis of "[t]he utility and advantages of

the patent property over alternatives that could have been written into the standard instead of the

patented technology in the period before the standard was adopted."  *Id.* at *53.  Although the

Federal Circuit in *D-Link* noted the damages calculation in *Innovatio* need not be mirrored, it did

hold that for SEP's "the patent holder should only be compensated for the approximate

incremental benefit derived from his invention[.]" *D-Link Sys.,* 773 F.3d at 1231-1232.  Thereby

requiring "the royalty for SEPs [to] reflect the approximate value of that technological

contribution, not the value of its widespread adoption due to standardization." *Id.* at 1233.

Both the Federal Circuit and this district have determined royalty rates based on the

incremental benefit derived from an invention by comparing the accused product to non-

infringing alternatives. *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir.

2015); *see also Intel Corp. v. Future Link Sys., LLC*, No. 14-377-LPS, 2017 U.S. Dist. LEXIS

91699, at *7 (D. Del. June 1, 2017).  "When an infringer can easily design around a patent and

replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the

product is typically low." *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334-35 (Fed. Cir.

2015) (citing *Grain Processing*, 185 F.3d at 1347; *Riles v. Shell Exploration & Prod. Co*., 298

F.3d 1302, 1312 (Fed. Cir. 2002) ("The economic relationship between the patented method and

non-infringing alternative methods, of necessity, would limit the hypothetical negotiation.").  In

determining a FRAND royalty in *Microsoft v. Motorola*, the district court explained how an

evaluation of alternatives can separate out the value (if any) of a patent's technical contribution:

> If alternatives available to the patented technology would have provided the same or
> similar technical contribution to the standard, the actual value provided by the patented
> technology is its incremental contribution.  [Citation omitted].  Thus, comparison of the
> patented technology to the alternatives that the SSO could have written into the standard
> is a consideration in determining a RAND royalty.

2013 WL 2111217, at *13 (W.D. Wash. Apr. 25, 2013).

Thus, in order to determine the incremental value of the patented technology incorporated

into a  SEP, one should look at available alternatives that could have been incorporated into the

standard, and not those that were later during infringement period.  *See Audio MPEG, Inc.*, 2017

U.S. Dist. LEXIS 166459 at *10; *D-Link Sys.*, 773 F.3d at 1232.  Thus, contrary to Evolved's

argument, HTC need not show the non-infringing alternatives were available "during the time of

infringement" (*see* Br. at 14-15), as it does not apply to the SEP context.  *See D-Link*, 773 F.3d at 1232; compare *Grain Processing Corp. v. American Maize-Product Co.* 185 F.3d 1341, 1355 (Fed. Cir. 1999); *see also LaserDynmics, Inc., v. Quanta Comput. Inc.,* No. 2:06-cv-348, 2011 U.S. Dist. LEXIS 5422, *9-12 (E.D. Tex. Jan, 2011).

Consistent with Dr. Kakaes's opinion, HTC needs only to show that the non-infringing alternatives were available at the time the technology was adopted into the standard.  *See Innovatio,* 2013 U.S. Dist. LEXIS 144061 *53.  Evolved admits that Dr. Kakaes opines that most of the proffered alternatives were actually submitted to ETSI in proposals during the LTE standard development process, and thus, were available prior to standardization.  (D.I. 291 at 15, Ex. 7 ¶¶ 120, 173, 226.)  For the one alternative not submitted to ETSI, Dr. Kakaes opines a person of ordinary skill in the art ("POSITA") would have known, based on at least the standards, the non-infringing alternative (*i.e.,* constructing a Msg3 buffer "on-the-fly" rather than constructing and storing it for future use). (*Id.* ¶ 195-202.)  Evolved does not argue in its brief that any of the non-infringing alternatives are insufficient as alternatives to the standard.  Dr. Kakaes's opinion is based on a reliable methodology, and Evolved's motion should be denied.

**2.**    **Dr. Kakaes Provide Sufficient Motivation Why to Combine Prior Art Combined, And Such Analysis Goes to The Weight Not Admissibility of His Testimony**

Evolved seeks to exclude Dr. Kakaes' obviousness opinions for the '373 patent by rearguing is motion for summary judgement of validity. (D.I. 237 at 30-36).  As in its summary judgement motion, Evolved grossly misstates Dr. Kakaes's opinions, Dr. Kakaes did testify that a person of ordinary skill in the art *would* combine the prior art references.  (*See* D.I. 252 (Defendant's Opposition to Evolved's Validity Motion) at 32-39).  For example, Dr. Kakaes explicitly states that a POSITA "would" be motivated to combine these references. (*See, e.g.*, D.I. 254, Ex. 1 (Kakaes Op.) at ¶ 454 ("For the following reasons, POSITAs ***would*** have

combined Hu's teachings with Wang's teachings."), ¶ 469 ("For the following reasons, POSITAs *would* have combined Hu's teachings with NEC 106's teachings.") (emphasis added)).   In addition, to support his opinions for each combination, Dr. Kakaes' opening invalidity report details the combinations at issue including why and how a POSITA would combine the references to arrive at the alleged invention of the '373 patent.  (D.I. 252 at 32-39); *see also Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1367 (Fed. Cir. 2012) ("Whether there is a reason to combine prior art references is a question of fact.")).

Tellingly, as discussed in the summary judgment briefing,  Evolved's expert, Dr. Cooklev understands Dr. Kakaes' positions, and responds to them. (D.I. 252 at 32-39.) The experts' conflicting opinions merely illustrate that Dr. Kakaes did, in fact, address motivation to combine. *See i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 852 (Fed. Cir. 2010) ("When the methodology is sound, and the evidence relied upon sufficiently related to the case at hand, disputes about the degree of relevance or accuracy (above this minimum threshold) may go to the testimony's weight, but not its admissibility.").  Therefore, as there is clearly a difference in opinion, whether such "motivations to combine" are sufficient goes to the weight of Dr. Kakaes's testimony, and not to its admissibility.  *Daubert,* 509 U.S. at 595 ("The focus [of the admissibility inquiry], of course, must be solely on principles and methodology, not on the conclusions that they generate.").  Thus, excluding Dr. Kakaes' opinions are inappropriate here.

## VI.    CONCLUSION

For at least the foregoing reasons, Evolved's *Daubert* Motion should be denied.

OF COUNSEL:

Stephen S. Korniczky
Martin R. Bader
Ericka Schulz
Nam H. Kim
Eric K. Gill
SHEPPARD, MULLIN, RICHTER &
HAMPTON, LLP
12275 El Camino Real, Suite 200
San Diego, CA 92130
(858) 720-8900

Dated:  January 12, 2018
Public version dated: January 19, 2018
5602250

POTTER ANDERSON & CORROON LLP

By:  */s/ Philip A. Rovner*
    Philip A. Rovner (#3215)
    Jonathan A. Choa (#5319)
    Hercules Plaza
    P.O. Box 951
    Wilmington, DE  19899
    (302) 984-6000
    provner@potteranderson.com
    jchoa@potteranderson.com

*Attorneys for Defendants*
*HTC Corporation and HTC America, Inc.*